On appellant's petition for reconsideration filed January 4, reconsideration allowed; opinion (116 Or App 647, 842 P2d 460) modified and adhered to as modified April 14, reconsideration denied June 2, petition for review denied September 21, 1993 (317 Or 584)

## STATE OF OREGON,
*Respondent,*

*v.*

## JAMES EDWARD TAYLOR,
*Appellant.*

(CR91-121A; CA A71460)

850 P2d 1118

Sally L. Avera, Public Defender, and Jesse Wm. Barton, Deputy Public Defender, Salem, for petition.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

EDMONDS, J.

Warren, P. J., dissenting.

## EDMONDS, J.

Defendant appealed his convictions for arson in the first degree, ORS 164.325, two counts of burglary in the first degree, ORS 164.225, and theft in the first degree. ORS 164.005. We affirmed. 116 Or App 647, 842 P2d 460 (1992). Defendant filed a petition for review, which we treat as a petition for reconsideration. ORAP 9.15. We allow the petition, and adhere to our earlier decision.

In that opinion, we agreed with the trial court that the officer who had stopped defendant and his passenger had reasonable suspicion to make further inquiries about the contents of the vehicle. Defendant and the dissent argue that there is no evidence that the officer recognized the bulky object underneath the passenger's legs as a pillowcase before it was searched. The trial court made findings to the contrary that are supported by evidence. The court said:

"The following constitute my findings and conclusions based upon my review of the evidence taken at the hearing on May 10, 1991.

"* * * * *

"While on patrol Officer Page was aware * * * of a recent aborted armed robbery and burglary involving multiple suspects and the use of walkie-talkies. He was also aware that an individual named James Rich who lived on 3rd Street in Yamhill was a suspect in the armed robbery/burglary, a convicted burglar and drug dealer.

"Officer Page noticed a grey station wagon which he had never seen before. He followed the vehicle for a short distance. The driver committed a traffic infraction and Page stopped the vehicle. * * *

"Officer Page asked Taylor for his drivers' license. Taylor stated he had 'none' and he gave Page his date of birth. Page ran his name through the MVD records and Taylor came back 'suspended.'

"When Page returned to the car, *he observed inside the vehicle a bulky pillowcase with jagged edges sticking out from underneath the passenger's legs*. He also saw in the back seat head phones with antennas which appeared to be similar to walkie-talkies or two-way radios used in the robbery discussed above. Based upon his training and experience Page knew that burglars frequently used walkie-talkies and

*pillowcases* to collect stolen articles while inside the victim's house.

"Page asked defendant what was in the *pillowcase*. The defendant stated it was 'personal, and he could not tell.' Upon repeating his request, defendant said it was 'women's underwear and things.' The *pillowcase* did not appear to contain soft items. Defendant's explanation was inconsistent with the item's appearance.

"Page inquired as to what they were doing on 3rd Street in Yamhill. Defendant advised 'they were over to see a guy named "Rich."['] Page knew the only Rich on 3rd Street was the individual described above. He then radioed for backup as he suspected defendant and his passenger of criminal activity." (Emphasis supplied.)

■■    We are bound by the trial court's historical findings when there is evidence to support them. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). Page testified:

"A.    And when I walked back up to the car on the passenger — on the driver's side and passenger in the rear seat, there was [*sic*] two sets of headphones, like a two-way radio type that had the microphone that comes in front of the mouth, and two antennas, one to transmit and one to receive.

"And there was [*sic*] two black boxes under them. I also noticed a bulky rounded thing with jagged edges underneath the passenger's legs by the front seat. I asked the driver what was in it, and he said that it was personal, he couldn't tell me.

"* * * * *

"Q.    Okay. So, you asked about — what was it about the mound of things on the floorboard that made you ask questions?

"A.    The part that was sticking out had a lot of little jagged edges sticking out. I kept, I asked the driver again what was in it, and he said it was personal, he couldn't tell me.

"I said, 'Come on, you can tell me.'

"He finally said, 'Well, okay. It is women's underwear and things.'

"At that point, I became extremely suspicious.

"Q.    Maybe it is obvious, maybe you can explain why?

"A.    Pardon me?

"Q.   It is probably obvious, but maybe explain why you became extremely suspicious?

"A.   Because the *pillowcase* was not shaped like a soft, like clothing would be where it would be rounded, it may have some big bulges, but not a lot of little ones.

"I felt he wasn't telling me the truth." (Emphasis supplied.)

He summarized his observations before he searched the pillowcase:

"At this point, I felt that I had a burglary that just occurred. I had the open container with the two-way radios, the *pillowcase* with the jagged edges in it that didn't match up with what he told me it was. He told me the headsets were stereo. They weren't." (Emphasis supplied.)

In the light of the fact that the officer observed the bulky object underneath the passenger's legs in the front seat of an automobile from a short distance outside the automobile, the court could reasonably infer from this testimony that the officer recognized the object as a pillowcase before he searched it.

Even if the court could not make that inference, it is apparent from the description given by the officer that the pillowcase was some type of bag that contained objects in it that had jagged edges. In the light of that observation and the other information that he had before he asked what was in the pillowcase, he had reasonable suspicion that justified his asking more questions. Thereafter, he discovered the connection between defendant and a convicted burglar who was a suspect in the other crime, and at that time, all of the information that he had constituted probable cause to search the pillowcase for the fruits of a burglary.

The dissent relies on *State v. Bates*, 304 Or 519, 747 P2d 99 (1987). The facts of that case are inapposite. In *Bates*, a police officer stopped the defendant for excessive vehicle emissions in a "high crime residential area." The defendant was driving in an otherwise lawful manner in an automobile with Washington license plates. The officer approached the vehicle and asked the defendant for his driver's license. In the automobile in plain view was a television and a video cassette recorder. The officer shined his flashlight down between the

defendant's feet and "could make out just the end of what appeared to be some kind of a bag." The defendant refused to pull the bag into view. The officer drew his service revolver and ordered defendant out of the automobile. He retrieved the closed black bag from under the front seat, felt something hard inside it, opened it and found drugs and drug paraphernalia. The state argued that, once the defendant was validly stopped, the officer reasonably suspected that he was armed and dangerous and, therefore, the officer was entitled to take reasonable steps to protect himself. The court held that none of those circumstances, individually or collectively, justified a suspicion on the part of the officer that the defendant posed an immediate threat. The facts in *Bates* are far different from the facts here, where the officer was able to tie the contents of the vehicle to information of a prior crime committed in the area. The trial court did not err when it held that these facts constituted reasonable suspicion to further pursue the investigation.

Reconsideration allowed; opinion modified and adhered to as modified.

**WARREN, P. J.,** dissenting.

On reconsideration, the majority concludes that the officer who stopped defendant and his passenger had reasonable suspicion that a crime had been committed, allowing the officer to make further inquiries about the contents of the vehicle.

The majority relies, in part, on the trial court's findings, which state that the officer observed a "bulky pillowcase with jagged edges sticking out of underneath the passenger's legs" and head phones with antennas "which appeared to be similar to walkie-talkies or two-way radios" used in a recent armed robbery. The trial court concludes that the officer had reasonable suspicion, because the officer knew that "burglars frequently used walkie-talkies and pillowcases to collect stolen articles while inside the victim's house."

Evidence in the record must support the trial court's findings. *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). There is no evidence in the record that the officer recognized the item beneath the passenger's legs as a pillowcase *before* he began his inquiry. The majority quotes extensively from the

officer's testimony and his use of the word "pillowcase" to attempt to show that the officer knew that he was viewing a pillowcase at that time. However, his testimony regarding his knowledge before he began asking further questions is more limited:

> "A. And when I walked back up to the car on the passenger—on the driver's side and passenger in the rear seat, there was [sic] two sets of headphones, like a two-way radio type that had the microphone that comes in front of the mouth, and two antennas, one to transmit and one to receive.

> "And there was [sic] two black boxes under them. I also noticed a bulky rounded thing with jagged edges underneath the passenger's legs by the front seat. I asked the driver what was in it, and he said that it was personal, he couldn't tell me.

> "* * * * *

> "Q. Okay. So you asked about—what was it about the mound of things on the floorboard that made you ask questions?

> "A. The part that was sticking out had a lot of little jagged edges sticking out. I kept, I asked the driver again what was in it, and he said it was personal, he couldn't tell me."

The majority states that from the observation of the bulky object the officer could have inferred that he was viewing a pillowcase. There is no evidence in the record that the officer made such an inference. The trial court's finding is unsupported.

The majority then states that, even if the court could not make that inference, it was apparent that the officer viewed "a bag that contained objects in it that had jagged edges." The majority concludes that even without the knowledge that he was viewing a pillowcase, the officer still had enough information to reasonably suspect that defendant had committed a crime.

In our prior opinion, we concluded that "the observations of the radio equipment and the pillowcase during the traffic stop justified further inquiry in the light of the officer's previous information." 116 Or App 651. Our conclusion paralleled the trial court's findings, which stated, in pertinent part, "[b]ased on his training and experience Page knew that burglars frequently used walkie-talkies and pillowcases to

collect stolen articles while inside the victim's house." There is no evidence in the record that, based on the officer's training and experience, he had identified the "bulky rounded thing" as anything commonly associated with a crime.

The only other evidence is the officer's observation of two-way radio equipment and the officer's knowledge of a recent crime in the area in which walkie-talkies were used. The officer knew that the hand-held walkie-talkies used in the armed robbery that had occurred a month earlier were of a different make and style from the equipment observed in defendant's car. He also testified that the suspects in the armed robbery were already identified and under investigation. In other words, knowledge of the armed robbery helped him to identify this equipment as within a class of equipment that had been used in a recent robbery, but did not make him suspect that defendant was involved in that crime. The officer had no knowledge of any more recent robbery or burglary in which two-way radios might have been used.

The facts in this case are similar to those in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987). After a valid stop, the officer in *Bates* saw a television, videocassette recorder, and an object that looked like a bag on the floor between the defendant's feet. The court held that sight of the items in the car combined with a late hour, a high crime area and out-of-state license plates did not give rise to reasonable suspicion. The court specifically pointed to the fact that there had been no recent burglary reported. 304 Or at 526.

There was also no recent reported robbery or burglary to connect to defendant. The observation of two-way radio equipment that fits in a category of equipment that has been commonly used in burglaries combined with the observation of a bulky rounded thing with jagged edges does not give rise to reasonable suspicion that a crime has been committed.

Respectfully, I dissent.